IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

TIMOTHY MCMULLEN                     :

    Plaintiff                     :

    v.                            : Case No. 3:16-CV-862

CAROLYN W. COLVIN                    : (Judge Richard P. Conaboy)
Acting Commissioner of
Social Security                      :

    Defendant                     :

_____

**Memorandum**

## I.   Background.

We consider here Plaintiff's appeal from an adverse ruling of
the Social Security Administration ("SSA" or Agency") on his
application for Disability Insurance Benefits ("DIB").  Plaintiff's
application alleging a period of disability beginning January 15,
2010 (R.191) was denied at the administrative level on June 18,
2013 (R.130-134), whereupon Plaintiff requested a hearing before
the Administrative Law Judge ("ALJ") on August 19, 2013 (R.139-
140).  Plaintiff's hearing was held via video conference with ALJ
Sharon Zanotto presiding on November 3, 2014.

On December 5, 2014, the ALJ issued a written opinion (R.47-
65) that was unfavorable to Plaintiff.  After Plaintiff requested
Agency review of the ALJ's decision, the Appeals Council, by notice
dated April 13, 2016, upheld the ALJ's decision and advised
Plaintiff that additional medical information he had submitted that
post-dated the date of the ALJ's decision was relevant only to a

new claim he could file for a period of disability beginning at some point after the date (December 5, 2014) of the ALJ's decision. The Appeals Council's denial of Plaintiff's request for review constitutes a final decision by the Agency and leaves this Court with jurisdiction over the instant appeal pursuant to 42 U.S.C. § 405(g).  The parties have fully briefed (Docs. 16, 22 and 23) the issues and this case is now ripe for disposition.

**II.  Testimony Before the ALJ.**

On November 3, 2014, Plaintiff had his hearing before the ALJ. Testimony was taken from the Plaintiff and from Andrew Capperelli, a Vocational Expert.  Also present was Plaintiff's counsel, Adam Crosier.

Plaintiff's testimony may be summarized as follows.  On the date of his hearing Plaintiff was an inmate at SCI Frackville.  He was born on June 21, 1961 and was 53 years of age at the time of the hearing.  He is single and has no children under the age of 18. Since his alleged disability date (January 15, 2010) Plaintiff had been incarcerated or otherwise subject to a criminal justice sentence at various prisons, rehabilitation facilities, and community confinement centers from November 30, 2011 through the date of his hearing.  (R.74-78).

Plaintiff's last job prior to his alleged disability date was at the Waffle House.  He could not specifically recall when or for how long he worked at the Waffle House.  He has not worked at all

2

since being incarcerated in November of 2011.  Plaintiff graduated from high school in 1980 whereupon he joined the army and served two tours of duty in South Korea.  While in high school at the Milton Hershey School Plaintiff had special vocational training in agriculture.  Despite the fact that he successfully graduated, Plaintiff stated that he has problems with math and reading comprehension.  (R.78-80).

Plaintiff stated that he found military service difficult because he had difficulty following orders and he got into numerous fights.  These problems resulted in disciplinary actions which, in turn, resulted in a general discharge.  He does not drive because his license is suspended due to convictions on drug charges.  He has also been convicted of a theft offense.  Plaintiff acknowledged doing community service work 20 hours per week at the York Rescue Mission Thrift Store incident to one of his incarcerations.  He described that work as one where he essentially did nothing but sit at a door and check bags.  (R.81-83).

Plaintiff also testified regarding his drug and alcohol abuse. He stated that he had not used either illegal drugs or alcohol since November 30, 2011 - - a period of almost three years.  He stated that during this period of abstinence, which was identical to his period of incarceration, he has continued to be alternately depressed and agitated.  He does not sleep well and states that despite his use of Zoloft he cannot calm down and has difficulty

3

concentrating.  He also stated that his motivation is low and that two or three times each month he will just remain in bed and not even get up for meals.  He is permitted to miss meals at his place of incarceration but he must go to meetings of his drug and alcohol and violence prevention groups.  Missing either of those meetings could jeopardize his parole.  (R.84-85).

Plaintiff states that he has been compliant with all his medications while incarcerated and has been seeing a psychologist and psychiatrist once every three months.  He can see the psychologist more often than that if he feels the need.  (R.86-89).

Upon questioning by his counsel, Plaintiff stated that he takes Lithium and that he believes one of its side effects is that he hears a muttering-type voice and begins to engage in a conversation with this voice.  He is aware that he should not be engaging in this "conversation" but he cannot control himself at times.  On these occasions this typically goes on for up to half an hour.  He also stated that he continues to take Zoloft as directed but believes that it makes him hyperactive.  He has talked to the prison psychiatrist and asked to be prescribed Elavil to help him sleep and control his anxiety.  The psychiatrist has declined to prescribe Elavil.  (R.90-92).

Plaintiff testified further that he sleeps only about three hours per night because his mind races.  When his mind races he thinks about his childhood, a childhood that was characterized by

4

sexual abuse.  He thinks also about two of his granddaughters who died as infants.  He believes that the sexual abuse he suffered as a child ruined him.  (R.93-94). He described himself as a loner. He likes being alone because he has a propensity to share information about himself with others.  This sharing has caused problems such as being ridiculed by other inmates for discussing the sexual abuse he suffered.  As a result he has learned to keep to himself.  Also, he states that he is a bit paranoid and inclined to believe that other people are talking about him or planning to harm him.  This feeling has caused him to walk away from numerous jobs without notifying employers.  (R.95-97).  Plaintiff then recounted a succession of jobs he had held for brief periods of time in the distant past with Rockaway Bedding, Nostalgia Oak Warehouse, Nastasis, Intrapersonal, Federal Cleaning, Bagel Lovers, Spencer Gifts, and A.C. Moore's.   These jobs were all of the customer service or shelf stocking variety.  (R.99-102).

Testimony was also taken from Vocational Expert Andrew Capperelli.  Mr. Capperelli stated that he had reviewed Plaintiff's work history.  Plaintiff's work fits several profiles according to Mr. Capperelli.  Some of it was janitorial/cleaning work and some of it was kitchen helper type employment as defined in the Dictionary of Occupational Titles ("DOT").  All of Plaintiff's past relevant work was characterized by Mr. Capperelli as "medium unskilled".  (R.107-110).

In response to hypothetical questions posed by the ALJ and Plaintiff's counsel, Mr. Capperelli stated that the Plaintiff could not perform some of his past relevant work because the danger posed by his use of blood thinners would be too great for him to work around moving machinery.  The vocational expert concluded however that Plaintiff could perform several light exertional category jobs such as "marker" or "mail clerk" that exist in significant numbers in the national economy.  When asked by Plaintiff's counsel whether Plaintiff could perform those occupations if one assumed that Plaintiff could have no contact with the public, no interaction with co-workers, and required supervision for up to two thirds of each working date, the Vocational Expert responded that Plaintiff would be unable to sustain employment even as a "marker" or "mail clerk". (R.111-112).

## III. Mental Impairment Evidence.[1]

Plaintiff suffers from bipolar disorder, depression, anti-social personality disorder, post-traumatic distress disorder and substance abuse disorder.  The ALJ has identified each of these conditions as "severe impairments".  (R.52).  Indeed, a succession of physicians and therapists have documented the presence of these mental impairments over a period of more than four years.  (R.55-58).  Despite the consistency of these diagnoses by multiple

---

[1] While the record includes evidence that Plaintiff has treated for such physical problems as a low back strain and a pulmonary embolism, this is essentially a mental disability case and Plaintiff's attorney has so acknowledged.  (R.71-72).

medical providers, the record contains very little information regarding the limiting effects of these "severe impairments" on the Plaintiff's capacity to perform gainful activity.

**A.   The Testimony of Dr. Thomas Fink.**

Perhaps the best evidence in the record regarding the limiting effects of Plaintiff's various impairments comes from Thomas Fink, Ph.D., the state agency's psychological consultant who assessed Plaintiff's functional abilities on June 12, 2013.  Dr. Fink found that Plaintiff had mild restrictions in his activities of daily living; moderate difficulties in maintaining concentration persistence and pace; and moderate difficulties in maintaining social functioning. (R.118-28).  Other than Dr. Fink's assessment, no other medical professional has attempted to quantify the extent to which Plaintiff's established "severe limitations" affect his ability to work.

**B.   Treatment at the Lebanon, Pennsylvania Veteran's Administration Hospital.**

Plaintiff was treated by an array of physicians at the Lebanon Veteran's Administration Hospital.  On May 31, 2013, he was seen by Dr. Robert A. Kirk, a psychiatrist.  Dr. Kirk assessed Plaintiff to have a stable level of consciousness throughout the interview on that date.  He detected no abnormal movements or tremors nor did he observe psychomotor agitation or retardation.  Plaintiff's attitude was cooperative, his speech rate was normal and articulate, and his

thought process was linear without any flight of ideas.  Dr. Kirk assessed that Plaintiff's thought content revealed no evidence of delusion or paranoia and was appropriate to the situation. Plaintiff expressed no homicidal or suicidal ideation, his affect was congruent, and both his judgment and insight were described as fair.  Dr. Kirk's diagnoses were cocaine dependence in remission, alcohol dependence in remission, mood disorder, NOS, post-traumatic stress disorder, and pain disorder.  He assigned Plaintiff a Global Assessment of Functioning ("GAF") Score of 50.  (R.634-637).

On three occasions between June 4, 2013 and July 2, 2013, Plaintiff was seen by Dr. Steven H. Williams, Ph.D., a Veteran's Administration psychologist working in concert with Dr. Kirk.  On each of these occasions Dr. Williams assessed Plaintiff's speech to be clear and logical without overt evidence of a thought disorder or other psychotic process.  On each of these occasions Dr. Williams found that Plaintiff's mood was pleasant with full affect, his cognition was grossly intact, and he presented with no active or passive suicidal ideation, intent, or plan.  On June 28, 2013, Plaintiff confided in Dr. Williams that he felt stressed by the rules at his half-way house and by the fact that he had a pending disability claim.

Dr. Williams consistently assessed Plaintiff to be suffering from post-traumatic stress disorder, cocaine dependence in remission, alcohol dependence in remission, mood disorder, NOS, and

pain disorder.  Like Dr. Kirk, Dr. Williams assessed Plaintiff to exhibit a GAF level of 50 on each occasion that he examined him. (R.609-627).

On June 28, 2013, Dr. Ellen A. Johnson, a medical doctor in the employ of the Veteran's Administration, authored a note indicating that she was following Plaintiff and that, "due to his ongoing mental health issues and back problems", he would be unable to work for the next 12 months.  Dr. Johnson provided no further elaboration of what mental health issues and back problems contributed to her assessment that Plaintiff was at that time disabled.  (R.613).

**C.    Mark Pentz, Licenced Professional Counselor.**

Mr. Pentz saw Plaintiff on ten occasions between April of 2013 and June of 2013.  Two of these occasions were independent counseling sessions and the other eight involved Plaintiff as part of group sessions.  Mr. Pentz noted the various diagnoses of the physicians referenced above and opined that it would be challenging for Plaintiff to interact with others in an occupational setting. Mr. Pentz also stated that Plaintiff would have difficulty adjusting to a work setting due to "over-the-top" behaviors.  He described Plaintiff as "loud, argumentative, and defensive." (R.940-941).

**D.   Evidence Provided by Other Physicians.**

Plaintiff saw several other physicians while incarcerated. On July 13, 2011, Plaintiff was admitted to Lancaster General Hospital after a suicide attempt in which he reportedly ingested 24 Seroquel tablets, 12 Tylenol with Codeine tablets, a six-pack of beer, and an indeterminate amount of cocaine.[2]  Plaintiff reported that he had been feeling agitated and irritated, had not been eating, and had been crying and sleeping most of the day.  He was involved in individual and group therapy after being diagnosed with mood disorder, polysubstance abuse by history, cluster B personality traits, and, upon admission, a GAF of 30.  After eight days of counseling and receipt of prescriptions for Celexa and Seroquel, Plaintiff was discharged on July 21, 2011 with an assessed GAF Score of 50 (T.401-402).

On November 30, 2011, Plaintiff was transported from the Lancaster County Prison to Lancaster General Hospital once again due to a suspected overdose of Seroquel.  The examining physician, Dr. Trystan Davies, noted incoherent speech, tired mood, blunted affect and impaired memory.  Plaintiff was observed for three hours and was then deemed stable for discharge whereupon he was released to prison officials.  (R.644-764).

Between December 13, 2011 and May 15, 2012, Plaintiff saw Dr.

---

[2] Seroquel is an anti-psychotic medication used to treat schizophrenia, depression, and bipolar disorder.  www.webmd.com.

Marc Turgeon, D.O., on at least four occasions.  On December 13, 2011, Plaintiff presented with complaints of panic attacks and also reported that he was doing better without his medication.  On January 10, 2012, Dr. Turgeon noted increased depression due to the death of Plaintiff's brother and prescribed Zoloft.  On February 16, 2012, Plaintiff complained of nightmares and difficulty sleeping thus causing Dr. Turgeon to add Elavil to his medications. On May 15, 2012, Dr. Turgeon described Plaintiff as stable and noted Plaintiff's self-assessment that he was doing well.  (R.312-359).

On September 9, 2013, while incarcerated at SCI Camp Hill, Ralph Tomei, M.D., the prison psychiatrist, evaluated Plaintiff. Dr. Tomei found Plaintiff to be alert and oriented to person, place, and time and that Plaintiff was not agitated.  Dr. Tomei also observed that Plaintiff maintained good eye contact, denied suicidal or homicidal ideation, presented with calm affect and cooperative attitude, and that Plaintiff's insight, judgement, and both recent and remote memory were intact.  Dr. Tomei recommended that Plaintiff continue taking Elavil and Zoloft and continue participation in the prison's drug and alcohol program.  (T.988-989).

On September 2, 2014, Plaintiff underwent a parole evaluation by Dr. David Ahner, D.O., at SCI Mahanoy.  Dr. Ahner described Plaintiff as fully compliant with his psychiatric treatment and

psychotropic medications.  He stated that Plaintiff was stable.  He noted Plaintiff's longstanding diagnoses of bipolar disorder, depression, personality disorder, NOS, anti-social behavior, and polysubstance dependence.  Dr. Ahner recommended that Plaintiff's parole plan include out-patient psychiatric evaluation, medication management, and continued drug and alcohol treatment to include attendance at AA meetings.  (R.1229-1230).

**IV.  ALJ's Decision.**

The ALJ's decision (Doc. 14-2 at 47-65) was unfavorable to the Plaintiff.  It included the following Findings of Fact and Conclusions of Law:

> 1.  The claimant meets the insured status requirements of the Social Security Act through March 31, 2015.
>
> 2.  The claimant has not engaged in substantial gainful activity since January 15, 2010, the alleged onset date.
>
> 3.  The claimant has the following severe impairments:  bipolar disorder, depression, anti-social personality disorder, post-traumatic stress disorder, and substance abuse disorder.
>
> 4.  The claimant does not have an impairment or combination of impairments that meets or

medically equals the severity of one of the
listed impairments in 20 CFR Part 404, Subpart
T, Appendix 1 (20 CFR 404.1520(d), 404.1525 and
404.1526).

5.  After careful consideration of the entire
record, the undersigned finds that the claimant
has the residual functional capacity to perform
a full range of work at all exertional levels
but with the following non-exertional
limitations: the claimant is unable to climb
ladders, ropes, and scaffolds and should avoid
moving mechanical parts and unprotected
heights due to chronic coumadin treatment.  The
claimant is able to perform work involving
occasional interaction with co-workers,
supervisors, and the public.

6.  The claimant is capable of performing past-
relevant work as a kitchen helper.  This work
does not require the performance of work-
related activities precluded by the claimant's
residual functional capacity.

7.  The claimant has not been under a disability as
defined in the Social Security Act, from
January 15, 2010, through the date of this

decision.

## V.   Disability Determination Process.

The Commissioner is required to use a five-step analysis to determine whether a claimant is disabled.[3]  It is necessary for the Commissioner to ascertain: 1) whether the applicant is engaged in a substantial activity; 2) whether the applicant is severely impaired; 3) whether the impairment matches or is equal to the requirements of one of the listed impairments, whereby he qualifies for benefits without further inquiry; 4) whether the claimant can perform his past work; 5) whether the claimant's impairment together with his age, education, and past work experiences preclude him from doing any other sort of work.  20 CFR §§ 404.1520(b)-(g), 416.920(b)-(g); *see Sullivan v. Zebley*, 493 U.S.

---

[3]  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less that 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).  The Act further provides that an individual is disabled

> only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A).

521, 110 S. Ct. 885, 888-89 (1990).

The disability determination involves shifting burdens of proof. The initial burden rests with the claimant to demonstrate that he or she is unable to engage in his or her past relevant work. If the claimant satisfies this burden, then the Commissioner must show that jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform. *Mason v. Shalala*, 993 F.2d 1058, 1064 (3d Cir. 1993).

As set out above, the instant decision was decided at the fifth step of the process when the ALJ found there are jobs that exist in the national economy that Plaintiff is able to perform. (R. at 54).

## VI. Standard of Review

This Court's review of the Commissioner's final decision is limited to determining whether there is substantial evidence to support the Commissioner's decision. 42 U.S.C. § 405(g); *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999). Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *see also Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981). The Third Circuit Court of Appeals further explained this standard in *Kent v. Schweiker*, 710 F.2d 110 (3d Cir. 1983).

This oft-cited language is not . . . a

talismanic or self-executing formula for
adjudication; rather, our decisions make
clear that determination of the existence *vel
non* of substantial evidence is *not* merely a
quantitative exercise.  A single piece of
evidence will not satisfy the substantiality
test if the Secretary ignores, or fails to
resolve, a conflict created by countervailing
evidence.  Nor is evidence substantial if it
is overwhelmed by other evidence--
particularly certain types of evidence (e.g.,
that offered by treating physicians)--or if
it really constitutes not evidence but mere
conclusion.  *See Cotter*, 642 F.2d at 706
("Substantial evidence" can only be
considered as supporting evidence in
relationship to all the other evidence in the
record.") (footnote omitted).  The search for
substantial evidence is thus a qualitative
exercise without which our review of social
security disability cases ceases to be merely
deferential and becomes instead a sham.

710 F.2d at 114.

16

This guidance makes clear it is necessary for the Secretary to analyze all evidence.  If she has not done so and has not sufficiently explained the weight given to all probative exhibits, "to say that [the] decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." *Dobrowolsky v. Califano*, 606 F.2d 403, 406 (3d Cir. 1979).  In *Cotter*, the Circuit Court clarified that the ALJ must not only state the evidence considered which supports the result but also indicate what evidence was rejected: "Since it is apparent that the ALJ cannot reject evidence for no reason or the wrong reason, an explanation from the ALJ of the reason why probative evidence has been rejected is required so that a reviewing court can determine whether the reasons for rejection were improper." *Cotter*, 642 F.2d at 706-07.  However, the ALJ need not undertake an exhaustive discussion of all the evidence.  *See*, *e.g.*, *Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000).  "There is no requirement that the ALJ discuss in its opinion every tidbit of evidence included in the record."  *Hur v. Barnhart*, 94 F. App'x 130, 133 (3d Cir. 2004).  "[W]here [a reviewing court] can determine that there is substantial evidence supporting the Commissioner's decision, . . . the *Cotter* doctrine is not implicated."  *Hernandez v. Commissioner of Social Security*, 89 Fed. Appx. 771, 774 (3d Cir. 2004) (not precedential).

17

A reviewing court may not set aside the Commissioner's final decision if it is supported by substantial evidence, even if the court would have reached different factual conclusions. *Hartranft*, 181 F.3d at 360 (*citing Monsour Medical Center v. Heckler*, 806 F.2d 1185, 1190-91 (3d Cir. 1986); 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . .").  "However, even if the Secretary's factual findings are supported by substantial evidence, [a court] may review whether the Secretary, in making his findings, applied the correct legal standards to the facts presented."  *Friedberg v. Schweiker*, 721 F.2d 445, 447 (3d Cir. 1983) (internal quotation omitted).  Where the ALJ's decision is explained in sufficient detail to allow meaningful judicial review and the decision is supported by substantial evidence, a claimed error may be deemed harmless.  *See*, *e.g.*, *Albury v. Commissioner of Social Security*, 116 F. App'x 328, 330 (3d Cir. 2004) (not precedential) (citing *Burnett v. Commissioner*, 220 F.3d 112 (3d Cir. 2000) ("[O]ur primary concern has always been the ability to conduct meaningful judicial review.").  An ALJ's decision can only be reviewed by a court based on the evidence that was before the ALJ at the time he or she made his or her decision.  *Matthews v. Apfel*, 239 F.3d 589, 593 (3d Cir. 2001).

**VII. Discussion.**

**A. General Considerations**

18

At the outset of our review of whether the ALJ has met the substantial evidence standard regarding the matters at issue here, we note the Third Circuit has repeatedly emphasized the special nature of proceedings for disability benefits. *See Dobrowolsky*, 606 F.2d at 406.  Social Security proceedings are not strictly adversarial, but rather the Social Security Administration provides an applicant with assistance to prove his claim. *Id.* "These proceedings are extremely important to the claimants, who are in real need in most instances and who claim not charity but that which is rightfully due as provided for in Chapter 7, Subchapter II, of the Social Security Act." *Hess v. Secretary of Health, Education and Welfare*, 497 F. 2d 837, 840 (3d Cir. 1974).  As such, the agency must take extra care in developing an administrative record and in explicitly weighing all evidence. *Dobrowolsky*, 606 F.2d at 406.  Further, the court in *Dobrowolsky* noted "the cases demonstrate that, consistent with the legislative purpose, courts have mandated that leniency be shown in establishing the claimant's disability, and that the Secretary's responsibility to rebut it be strictly construed." *Id.*

**B. Plaintiff's Allegations of Error.**

   *1.*   **Whether the ALJ Erred in His Conclusion that Plaintiff's Back Pain and Pulmonary Embolism Were Not Severe Impairments?**

Plaintiff asserts that the ALJ erred at Step 2 of the Agency's

19

sequential evaluation process by finding that Plaintiff's back pain and pulmonary embolism did not constitute "severe impairments". Severe impairments are those that significantly limit a claimant's physical or mental ability to do basic work activities.  See 20 CFR § 404.1521(b)(1).  Defendant contends that the record indicates: (1) that Plaintiff's back pain had existed only sporadically and ultimately resolved; and (2) that Plaintiff's pulmonary embolism posed no significant limitation on Plaintiff's ability to work because it was treatable through the simple means of Warfarin therapy.

Our review of the record persuades the Court that the record does not sustain Plaintiff's argument.  The record is devoid of any diagnostic testing that indicates that Plaintiff has any structural deformity (e.g. a herniated disc or spondylolisthesis) which is producing chronic severe back pain.  Plaintiff's treatment records for back pain are sparse and sporadic as Defendant contends.  The only treatment Plaintiff has received for his sporadic bouts of back pain was very conservative and consisted of Tylenol, one regimen of a tapering dose of steroids, and gentle stretching.  The ALJ on the basis of the record before her rationally concluded that Plaintiff's sporadic back pain was not a severe impairment that imposed any significant limitations on Plaintiff's physical ability to work.

With respect to Plaintiff's pulmonary embolism, the record

reflects that the condition is controllable through the use of blood thinners.  The record contains no suggestion by any medical provider that Plaintiff's pulmonary embolism presents any significant impairment to Plaintiff's ability to work. Accordingly, we find that the AlJ permissibly concluded that Plaintiff's pulmonary embolism did not constitute a severe impairment.

2. **Whether the ALJ Erred in Finding that Plaintiff Did Not Meet The Criteria For Disability Under Listings 12.04, 12.06, and 12.08?**

Plaintiff asserts that the ALJ erred at Step 3 of the Agency's sequential evaluation process by finding that none of his severe impairments, singly or in combination, met one of the Agency's special listings, specifically those at SSR 12.04, 12.06, and 12.08.  We consider these in turn.

One way a claimant can qualify for benefits under Listing 12.04 is to meet the criteria of Part A and Part B of the listing. Listing 12.04 provides in Part A that an individual be affected by four of the following: pervasive loss of interest in all activities; appetite disturbance with change of weight; sleep disturbance; decreased energy; feelings of guilt or worthlessness; difficulty concentrating; and thoughts of suicide or delusional thinking.  The Court does find that Plaintiff is affected by the requisite four symptoms under 12.04 Part A.

To meet the Part B criteria under 12.04, Plaintiff's depression or bipolar disorder must cause two of the following: marked restrictions in activities of daily living; marked difficulties in maintaining social functioning; or marked difficulties in maintaining concentration, persistence or pace. Our review of the record discloses no medical documentation that Plaintiff suffers from "marked difficulties" in any of the Part B criteria.  The only documentation of the degree to which Plaintiff's impairments are disabling came from Dr. Fink and Marc Pentz.  Dr. Fink opined (See Page 7 ante) that Plaintiff had <u>mild to moderate </u>restrictions in these areas.  Marc Pentz opined (See Page 9 ante) that it would be "challenging" for Plaintiff to function in an occupational setting where he would have to interact with others.  The Court, however, will not accept Pentz's characterization of "challenging" as being the equivalent of a "marked difficulty". [4]  Accordingly, we conclude that Plaintiff has not demonstrated that he has met <u>both</u> the Part A and Part B criteria, a necessary prerequisite to support an award of benefits.

Plaintiff asserts also that he meets the criteria for an award of benefits pursuant to Listing 12.04 Part C.  To meet the Part C criteria, Plaintiff must demonstrate that he experienced three episodes of decompensation within a period of one year and that

---

[4] Pentz, a licensed professional counselor, is not an "accepted medical source" as defined in SSR 06-03p.

each such period lasted at least two weeks.  Plaintiff has

acknowledged (Doc. 16 at 22) that his three hospitalizations in the

period beginning June 21, 2010 through July 13, 2011 (which in the

aggregate amounted to only 14 days of hospitalization and did not

occur within the requisite one year period) "do not technically

meet the repeated episodes of decompensation each of extended

duration" requirement imposed by Listing 12.04 Part C.

Nevertheless, Plaintiff contends, without authority, that the

duration and severity of his episodes were such that they should be

considered the equivalent of the explicit requirements set forth in

the listing.  We cannot agree with this proposition in the absence

of any cited authority.  Accordingly, we conclude that Plaintiff,

by his own admission, does not meet the technical requirements of

Listing 12.04 C.

Finally, Plaintiff also contends that he meets the Listing at

12.04(c)(3) due to his alleged inability to function outside a

highly supported living arrangement for a period of at least one

year.  Plaintiff's counsel cites Plaintiff's extended incarceration

as proof of that proposition.  The Court finds this insufficient

and observes that if being incarcerated, without more, was proof of

an entitlement to disability under Listing 12.04(c)(3), much of the

nations's prison population would qualify for DIB upon completion

of their sentences.  Plaintiff's argument in this regard must be

rejected.[5]

### 3.   Whether Substantial Evidence Supports the ALJ's Evaluation of the Opinion Evidence?

Plaintiff contends that the ALJ's evaluation of the opinion evidence provided by Dr. Ellen A. Johnson, Marc Pentz, and Dr. Thomas Fink was flawed.  We shall consider the opinions provided by each in turn.

### A.   Dr. Johnson.

Dr. Johnson saw Plaintiff several times in May and June of 2013.  On June 28, 2013, she authored a letter indicating that "due to his ongoing mental health and back problems" Plaintiff would be unable to work for the next 12 months.  (T. at 613).  It is true that the opinion of a treating physician is normally entitled to great weight "especially when...based on continuing observation of the patient's condition over a prolonged period of time."  Morales v. Apfel, 225 F.3d 310, 317 (3d. Cir. 2000)(cited by Plaintiff; Docs. 16 at 23).  However, the record in this case does not support the inference that Dr. Johnson had the long linear relationship with Plaintiff envisioned by the Morales Court.  Beyond that, as noted by Defendant, the applicable regulations require that a

---

[5] Plaintiff makes similar arguments under the guise of Listing 12.06 (anxiety disorders) and Listing 12.08 (impulse control disorders).  These arguments fail for the same reason all his arguments under Listing 12.04 failed.  The record simply does not support the conclusion that his anxiety disorder or his anti-social personality disorder produced the requisite "marked restrictions" to support an award of DIB.

treating physician's opinion be given controlling weight only when it is well-supported by clinical and laboratory findings and not inconsistent with other substantial evidence of the record.  (See 20 CFR § 404.1527c)(2).  Our review of the record persuades the Court that Dr. Johnson's findings as expressed in her letter of June 28, 2013 are not supported by clinical or laboratory findings of record nor are they consistent with much evidence in the record that: (1) Plaintiff's back problems were sporadic and non-severe; and (2) Plaintiff's mental health issues were not severe enough to be considered disabling.  For these reasons, the Court will not fault the ALJ's decision to assign Dr. Johnson's opinion little weight.

**B.   Mark Pentz.**

Mark Pentz, a Licenced Professional Counselor, testified that, due to being loud, argumentative, and defensive Plaintiff would have difficulty adjusting to a work setting.  Plaintiff contends that the ALJ wrongfully assigned limited weight to Mr. Pentz's opinion because he is not "an acceptable medical source."  (R.59).  Plaintiff further contends SSR 06-03p provides that evidence from "non-acceptable medical sources" like licensed professional counselors can be used to show the severity of a claimant's impairments.  (Doc. 16 at 26).  This is true but not dispositive here.

The ALJ did not devalue Mr. Pentz's opinion simply because he did not meet the criteria to be an acceptable medical source. The ALJ also stated that Mr. Pentz's assessment of Plaintiff's capacity for work "is also not supported by the objective medical findings of record, the claimant's overall improvement with proper medication management, and the claimant's own reported daily activities." (R.59). Having reviewed the record, the Court finds that substantial evidence does exist in this record to support the ALJ's decision to accord limited weight to Mr. Pentz's opinion.

### C.   Dr. Fink.

Plaintiff asserts that the ALJ "cherry picked" the evidence without justification by crediting part of Dr. Fink's testimony but refusing to accept his conclusion that Plaintiff had moderate difficulty in maintaining concentration persistence and pace. (Doc. 16 at 27). Implicit in this argument is the notion that the ALJ's assessment of Plaintiff's work capacity did not include a proper evaluation of one of his impairments.

Defendant counters that Dr. Fink's knowledge of Plaintiff was derived only from his medical records inasmuch as Dr. Fink never had personal contact with Plaintiff. Defendant notes further that numerous of Plaintiff's mental status examinations demonstrate that: plaintiff had good attention and concentration (R.732); his cognitive function and memory were intact (R.442, 732, 989, 1009, 1023, 1025-27, 1028-30, and 1233); and his thought process was

linear, organized, logical and goal directed (R.429, 431, 433, 561, 574, 627, 635, 732, 983, 985-87, 1009, 1022-23, 1025-30, and 1233). (Doc. 22 at 32).  The ALJ also stated that he did not credit Dr. Fink's findings regarding Plaintiff's ability to maintain concentration, persistence and pace because that aspect of Dr. Fink's findings finds no support in the records compiled by Plaintiff's treating physicians.  The ALJ's conclusion in this regard has not been contradicted by any citation to the record from Plaintiff that indicates otherwise.  Thus, the Court will not fault the ALJ for accepting only those findings by Dr. Fink that actually find support in the medical records.[6]

4.     **Whether Substantial Evidence Supports the ALJ's Residual Functional Capacity ("RFC") Assessment?**

Plaintiff asserts that the ALJ's RFC assessment is unsupported by substantial evidence for three reasons: (1) that his various mental/emotional impairments "prevent him from meeting the basic mental demands of unskilled work"; (2) that the ALJ's RFC assessment failed to incorporate consideration of the side-effects of his medications; and (3) that the ALJ failed to include restrictions for Plaintiff's non-severe low back pain and pulmonary embolism.  (Doc. 16 at 31-33).

---

[6] Plaintiff also argues that the ALJ impermissibly substituted his judgement for that of Dr. Fink.  Our reading of the ALJ's opinion persuades the Court that the ALJ did nothing of the kind. Rather, she based her decision on the medical records compiled by the treating physicians.

Plaintiff's argument that his various mental/emotional impairments prevent him from meeting the basic requirements of unskilled work does not find medical support in the record.  While the record does indicate that Plaintiff has severe impairments in the form of depression, post-traumatic stress disorder, anxiety disorder, and bipolar disorder, no physician has concluded credibly that Plaintiff is disabled from these conditions.[7]  Plaintiff's assertions that these conditions were not adequately reflected in the ALJ's RFC assessment are just that, assertions.  Because medical support for Plaintiff's argument is lacking and in some ways even contradicted by the record, we find that the ALJ's restriction of Plaintiff to work involving only "occasional interaction with co-workers, supervisors, and the public" reasonably reflect that Plaintiff's established mental/emotional restrictions. (R.54).

Plaintiff's argument that the ALJ's RFC determination was defective because it did not adequately consider the side-effects of his medications on his ability to work is unpersuasive.  Here again, the Court has found nothing in the record indicating that any medical source supports the conclusion that the side-effects from Plaintiff's medications would significantly impair his ability to work.  Plaintiff's self-reporting that one of his medications

---

[7] The Court has already found that Dr. Johnson's opinion that Plaintiff would be unable to work for one year due to back problems and ongoing mental health problems (R.613) was entitled to little weight because it was unsupported by clinical and laboratory findings.  See pages 24-25 ante.

makes him tired and another makes him jittery (Doc. 16 at 32) do not suffice to establish that these side-effects are disabling. Plaintiff's failure to cite any medical source for this proposition requires a finding that the ALJ's RFC determination properly omitted any discussion of medication side-effects.

With respect to Plaintiff's argument (Doc. 16 at 33) that the ALJ's RFC determination failed to account for his non-severe physical impairments (back pain and pulmonary embolism), the Court has already found (pages 20-21 ante) that the record contains no documentation from any medical source indicating that these conditions present significant impairments to Plaintiff's ability to do physical work.  Accordingly, we reject Plaintiff's argument that the ALJ's RFC assessment improperly excluded physical limitations caused by back pain or pulmonary embolism.

### 5.   Whether Substantial Evidence Supports the ALJ's Determination of Plaintiff's Credibility?

Plaintiff's argument with the ALJ's assessment of his credibility is based on the premise that the ALJ placed undue emphasis on his acknowledgments concerning his activities of daily living, his receipt of unemployment benefits, and his filing of job applications during the period for which he claims disability. (Docs. 16 at 34-35).  It is certainly true that the ALJ's conclusion that Plaintiff was exaggerating his symptoms was partially based on these considerations.  However, as the Defendant

notes (Doc. 22 at 36-37): (1) the applicable regulations permit an ALJ to make a finding of non-disability based upon a claimant's pattern of daily activities (20 CFR § 404.1529(c)(3)(I); and (2) a claimant's applications for employment during a period of alleged disability call his credibility into question. Gardner v. Astrue, No. 12-193, 2013 WL 1207987 at 11 (M.D.Pa. March 25, 2013.

The Court also notes (as did the ALJ at Page 55 of the record) that the Plaintiff sought hospitalization in August of 2010 due to allegations of suicidal ideation. At that time the examining physician, Dr. Dilwyn Symes, M.D., stated unequivocally that Plaintiff's motives for coming to the hospital:

> "...involved a long-term pattern of utilizing drugs and alcohol, primarily as an excuse for poor behaviors. He has now got some legal troubles that do involve theft, which he claims to have happened while under the influence of drugs and alcohol. Whatever the truth of these legal charges, it was apparent to the treatment team here that he was not suffering from any major psychiatric illness. That is to say, he was not psychotic, manic, clinically depressed, suffering from OCD, etc. His statements of suicide were clearly manipulative in nature with a clear-cut secondary gain to avoid being jailed. I would put this under the category of malingering." (R.at 306).

Evidence such as this indicating a Plaintiff displayed a willingness to falsify or exaggerate his symptoms is obviously supportive of the ALJ's decision to attach only partial credibility to his statements.  For this and the other reasons stated above, the Court cannot conclude that the ALJ's evaluation of Plaintiff's credibility was unsupported by substantial evidence.

**6.    Whether the ALJ Erred by Not Finding That Plaintiff Meets the Criteria of Medical Vocational Guideline 201.12?**

As Plaintiff states (Doc. 16 at 36), Medical Vocational Guideline 201.12 provides, in pertinent part: "...individuals approaching advanced age (age 50-54) may be significantly limited in vocational adaptability if they are restricted to <u>sedentary</u> work when such individuals have no past work experience or can no longer perform vocationally relevant past work and have no transferable skills, a finding of disabled ordinarily applies." (emphasis supplied).  Plaintiff then continues to contend that Guideline 201.12 clearly supports a finding of disability in this case.  The Court must disagree.  The Court has already noted (pages 28-29 ante) that the ALJ's RFC determination is based upon substantial evidence of record.  That RFC determination specifically provides that claimant is physically capable of performing work at all exertional levels.  Because Guideline 201.12 requires that an individual approaching advanced age (such as Plaintiff) be

restricted to sedentary work before a finding of disability thereunder is warranted, and because the ALJ's RFC assessment does not limit Plaintiff to sedentary work, Plaintiff's argument regarding the applicability of Guideline 201.12 must be rejected.

      **7.**    **Whether the ALJ's Finding that Plaintiff Can Return to His Past Work As A Kitchen Helper is Based Upon Substantial Evidence of Record?**

The Court does agree that the ALJ's finding (R.at 59) that the claimant is capable of performing his past relevant work as a kitchen helper is somewhat suspect.  The ALJ had acknowledged in his RFC determination that Plaintiff's dependence on blood thinners had precluded his work at heights or around moving mechanical parts.  (R.54).  It seems obvious that the ALJ made this finding because Plaintiff could bleed excessively if he took a fall or came into contact with moving machinery.  One might well assume that a kitchen helper would encounter knives and other sharp objects routinely and would, thus, face the same hazards inherent in being around moving machinery.  Nevertheless, in response to the ALJ's hypothetical question concerning whether claimant could perform his past relevant work as a dishwasher/bus person, the vocational expert stated that such work was not classified as a hazardous occupation in the DOT.  The vocational expert went on to state that the kitchen helper job would be within the framework of the impairments lists in the hypothetical question both as actually

32

performed and as generally performed.  (R.107-08).  This testimony by the vocational expert constitutes substantial evidence and afforded the ALJ a reasonable basis for her conclusion that Plaintiff could perform his past relevant work as a kitchen helper.[8]  Accordingly, the Plaintiff's argument regarding the ALJ's determination that he could perform his past relevant work as a kitchen helper must fail.

**VIII.      Conclusion.**

        For the reasons stated above, the Court finds that the Commissioner's decision was supported by the requisite substantial evidence and that the Commissioner's decision to deny benefits in this case must be affirmed.  An Order to that effect will be filed contemporaneously with this Memorandum.

BY THE COURT

                                        S/Richard P. Conaboy
                                        Honorable Richard P. Conaboy
                                        United States District Court
Dated: January 25, 2017

---

[8] We note, too, that the ALJ also found, on the basis of substantial evidence, that Plaintiff could perform other jobs  (e.g. day worker, marker, and mail clerk) that exist in significant numbers in the national economy.  Thus, even if the Court found that Plaintiff could not perform his past relevant work, the ALJ's ultimate finding of non-disability would stand.